PERMOBIL, INC,       )
and GORAN UDDEN,      )
              )
   Plaintiffs,        )    **Case No.: 3:08-CV-0262**
              )    **Judge Trauger**
v.              )
              )
AMERICAN EXPRESS TRAVEL    )
RELATED SERVICES CO, INC., d/b/a   )
AMERICAN EXPRESS, and AMERICAN   )
EXPRESS BANK, FSB d/b/a AMERICAN   )
EXPRESS,          )
              )
   Defendants.       )

## MEMORANDUM

    Before the court is a Motion to Dismiss filed by the defendants (Docket No. 14), to which

the plaintiffs have responded (Docket No. 29), the defendants have replied (Docket No. 30), and

the plaintiffs have sur-replied (Docket No. 34). For the reasons discussed herein, the defendants'

motion will be granted as to the plaintiffs' negligence claim and denied as to the plaintiffs' Truth

in Lending Act, conversion, misrepresentation, and Tennessee Consumer Protection Act claims.

## FACTS

    Permobil, Inc. ("Permobil") is a Tennessee corporation that manufactures, distributes and

sells electric wheelchairs.[1] In 1993, through its then-President, Goran Udden, Permobil

contracted with American Express Travel Related Services Co., Inc. to obtain an American

Express Business Platinum Card, a corporate credit card account to be used for business

---

     [1]Unless otherwise noted, all facts are drawn from the Complaint. (Docket No. 1.)

purposes.[2] Under the contractual arrangement between Permobil and American Express, Permobil paid the charges on the account, while Udden remained personally liable for them.[3] At the time Permobil established the account with American Express, Permobil also authorized a small number of its employees to use the account for company purchases, issuing separate American Express credit cards to each of them. Each card carried the name of the company, "Permobil of America, Inc.," and the name of the authorized employee. Charles S. Combs, a Permobil sales representative, received one such card.

On February 27, 1995, Permobil hired Jennifer Haney as its accounts payable clerk. At some point thereafter, Mrs. Haney was promoted to accounts payable supervisor, a position she held until Permobil terminated her employment on December 4, 2007. As accounts payable supervisor, Mrs. Haney reviewed Permobil's American Express account and paid any charges on it, using funds from Permobil's bank account. Although she was responsible for reviewing and paying Permobil's American Express charges, Permobil did not issue Mrs. Haney her own American Express credit card or give her permission to make charges to the account.

On June 10, 2004, Mr. Combs terminated his employment with Permobil. At that point, through either theft or fraud, Mrs. Haney and her husband, Johnny Haney, obtained Mr. Combs' American Express card, which Permobil believed had been cancelled.[4] Upon acquiring Mr.

---

[2]American Express later assigned Permobil's account to American Express Bank. These two entities are referred to herein collectively as "American Express." Likewise, Permobil and Udden are referred to herein collectively as "Permobil."

[3]Udden remains a corporate officer, currently serving as Permobil's Director.

[4]According to the Complaint, "Mrs. Haney and/or her husband, Johnny Haney, stole and/or used fraudulent means to obtain, Mr. Combs' American Express card." (Docket No. 1 ¶ 9.)

2

Combs' card, Mr. Haney began to charge a variety of personal expenses to Permobil's American Express account, including expenses for food, restaurant dining, recreation, clothing, sporting goods, and travel. Mrs. Haney also made internet purchases using the American Express card. From June 10, 2004 through December 31, 2007, the Haneys accumulated $1,296,680.11 in unauthorized charges on Permobil's American Express account, which Mrs. Haney concealed by continuing to review and pay the Permobil account. In order to further ensure that neither Permobil's management nor its external accountants noticed the charges, Mrs. Haney spread payments to American Express among different accounts and cost centers on Permobil's accounting records. The plaintiffs allege that the Haneys also hid or destroyed any American Express statements that would have revealed their fraud. During this time period, American Express did not notify Permobil of any suspicious charges or unusual activity on its account. Despite Permobil's procedures for processing and paying its invoices, which included a review of its records by outside accountants, Permobil did not uncover the Haneys' activities until December 2007.

On December 3, 2007, Enterprise Fleet Services, a company through which Permobil rented and leased vehicles, notified Permobil of suspicious activity on its master corporate account with that company. Upon receiving notification of these suspicious activities, Permobil conducted an investigation and discovered evidence of the Haneys' transactions, which resulted in Permobil's terminating Mrs. Haney's employment and notifying local authorities.[5] Additionally, Permobil contacted American Express, informing it of the Haneys' fraudulent

---

[5] According to Permobil, Mrs. Haney was arrested, and federal authorities are planning to prosecute her. (Docket No. 1 ¶ 19.)

3

activities and requesting duplicate copies of its account statements. After reviewing these statements, Permobil promptly requested reimbursement for payments related to the Haneys' fraudulent transactions. However, American Express refused to reimburse Permobil.

## ANALYSIS

Permobil brought this action against American Express, alleging a violation of the Truth in Lending Act and various state law claims. (Docket No. 1.) American Express filed this Motion to Dismiss for failure to state a claim on each of the plaintiffs' claims. (Docket No. 14.)

### I.     Motion to Dismiss Standard

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will accept as true the facts as the plaintiff has pleaded them. *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002); *Performance Contracting, Inc. v. Seaboard Sur. Co.*, 163 F.3d 366, 369 (6th Cir. 1998). The Federal Rules of Civil Procedure require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "Indeed it may appear on the face of the pleadings that recovery is very remote and unlikely but that is not the test." *Scheuer*, 416 U.S. at 236. Rather, challenges to the merits of a plaintiff's claim should be "dealt with through summary judgment under Rule 56." *Swierkiewicz*, 534 U.S. at 514.

4

In *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S.Ct. 1955, 1964-65 (2007), the Supreme Court readdressed the pleading requirements under the federal rules. The Court stressed that, although a complaint need not plead "detailed factual allegations," those allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 1964-65. "The factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *League of United Latin Am. Citizens v. Bredesen*, No. 03-5306, 2007 U.S. App. LEXIS 20556, at *6 (6th Cir. Aug. 28, 2007) (citing *Twombly*, 127 S.Ct. at 1965). Further, the Court observed that Federal Rule of Civil Procedure 8(a)(2) does require a "showing" that the plaintiff is entitled to relief and that this substantive threshold is not achieved by conclusory assertions. *Twombly*, 127 S.Ct. at 1965 n.3.

Although Federal Rule of Civil Procedure 8 establishes a "liberal system of notice pleading," *see E.E.O.C. v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1964-65 (citing *Papasan v. Allain,* 478 U.S. 265, 286 (1986)). Accordingly, to survive a motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965; *see also Swierkiewicz*, 534 U.S. at 508 n.1; *Neitzke v. Williams,* 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer,* 416 U.S. at 236 (a well-pleaded complaint may proceed, even if it appears "that a recovery is very remote and unlikely"). With this standard in mind, the court turns to an analysis of the plaintiff's claims.

5

## II.    Truth in Lending Act

In 1970, Congress amended the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*

(2000), adding provisions "in large measure to protect credit cardholders from unauthorized use

perpetrated by those able to obtain possession of a card from its original owner." *Towers World*

*Airways, Inc. v. PHH Aviation Sys., Inc.*, 933 F.2d 174, 176 (2d Cir. 1991). These amendments

limited the liability of cardholders for all charges by third parties that are the result of

"unauthorized use," providing, "[w]here an unauthorized use has occurred, the cardholder can be

held liable only up to a limit of $50 for the amount charged on the card, if certain conditions are

satisfied."[6] *Id.* (citing 15 U.S.C. § 1643(a)(1)(B)). "Except as provided in section 1643, 'a

---

[6]The statute provides:

A cardholder shall be liable for the unauthorized use of a credit card only if —

(A) the card is an accepted credit card;

(B) the liability is not in excess of $50;

(C) the card issuer gives adequate notice to the cardholder of the potential liability;

(D) the card issuer has provided the cardholder with a description of a means by which the card issuer may be notified of loss or theft of the card, which description may be provided on the face or reverse side of the statement required by section 1637(b) of this title or on a separate notice accompanying such statement;

(E) the unauthorized use occurs before the card issuer has been notified that an unauthorized use of the credit card has occurred or may occur as the result of loss, theft, or otherwise; and

(F) the card issuer has provided a method whereby the user of such card can be identified as the person authorized to use it.

15 U.S.C. § 1643.

6

cardholder incurs no liability from the unauthorized use of a credit card.'" *Id.* (quoting 15 U.S.C. § 1643(d)).

TILA defines "unauthorized use" as the "use of a credit card by a person other than the cardholder who does not have actual, implied, or apparent authority for such use and from which the cardholder receives no benefit." 15 U.S.C. § 1602(o); Regulation Z, 12 C.F.R. § 226.12 (2008). By adopting this definition, "Congress apparently contemplated, and courts have accepted, primary reliance on background principles of agency law in determining the liability of cardholders for charges incurred by third-party card bearers." *Towers*, 933 F.2d at 176-77. Under these principles, authority "is the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him." Restatement (Second) of Agency § 7 (1958) (quoted in *Minskoff v. Am. Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. N.Y. 1996)). "Such authority may be express or implied, but in either case it exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act." *Minskoff*, 98 F.3d at 780 (citing Restatement (Second) of Agency § 7 cmt. b).[7]

In contrast to express or implied authority, "apparent authority exists entirely apart from the principal's manifestations of consent to the agent." *Towers*, 933 F.2d at 177. Rather, such authority "is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." Restatement

---

[7]For the purposes of this motion, American Express does not allege that Permobil vested Mrs. Haney with express or implied authority. (Docket No. 16 at 5.)

7

(Second) of Agency § 27 (quoted in *Towers*, 933 F.2d at 177). Apparent authority has also been described as agency by estoppel, since "its creation and existence depend upon such conduct by the apparent principal as will preclude him from denying another's agency."[8] *Boren ex rel. Boren v. Weeks*, 251 S.W.3d 426, 432 (Tenn. 2008) (quoting *White v. Methodist Hosp. S.*, 844 S.W.2d 642, 646 (Tenn. Ct. App. 1992)). "A principal may be estopped from denying apparent authority if (1) the principal's intentional or negligent acts, including acts of omission, created an appearance of authority in the agent, (2) on which a third party reasonably and in good faith relied, and (3) such reliance resulted in a detrimental change in position on the part of the third party." *Minskoff*, 98 F.3d at 708 (citing Restatement (Second) of Agency § 8B); *cf. Boren*, 251 S.W.3d at 433-34.

Generally, "[t]he existence of apparent authority is a question of fact that should normally be left to the jury." *DBI Architects, P.C. v. Am. Express Travel-Related Servs. Co.*, 388 F.3d 886, 890 (D.C. Cir. 2004); *see also White v. Revco Discount Drug Ctrs., Inc.*, 33 S.W.3d 713, 723 (Tenn. 2000) (citation and quotation omitted). Here, American Express argues that, based on the facts alleged in the Complaint, Permobil's actions and omissions cloaked the Haneys in apparent authority as a matter of law (Docket No. 30 at 5-6), and, therefore, Permobil is estopped from denying apparent authority (Docket No. 16 at 4-9). Within the context of TILA, at least two courts have concluded that certain actions or omissions on the part of a cardholder

---

[8]For purposes of this case, the court discerns no difference between Tennessee law of agency and common law principles of agency, and, therefore, it need not determine which provides the rule of decision. *Cf. DBI Architects, P.C. v. Am. Express Travel-Related Servs. Co.*, 388 F.3d 886, 890 (D.C. Cir. 2004) ("We need not decide whether District of Columbia law or the common law of agency provides the rule of decision, as we discern no difference between them for the purposes of this case.").

8

can establish apparent authority as a matter of law, although it is worth noting that, in both of those cases, that determination was rendered at the summary judgment stage rather than on a motion to dismiss. *See, e.g.*, *DBI Architects*, 388 F.3d at 890; *Minskoff*, 98 F.3d at 709-10.

The Second Circuit has concluded that a company's failure to review credit card statements constitutes a negligent omission that creates apparent authority to use the card in a person who obtained it through theft or fraud. *Minskoff*, 98 F.3d at 709. In *Minskoff*, a real estate firm's office manager, who was charged with reviewing the firm's American Express account, fraudulently obtained a corporate credit card in her name and subsequently charged over $400,000 in personal expenses to the account over the course of a year and one-half. *Id.* at 709-10. In considering whether such acts constituted "unauthorized use" under TILA, the Second Circuit drew a distinction between the office manager's acquisition of the card through fraud, for which she did not have apparent authority, and her subsequent use of the fraudulently obtained card, for which she did. *Id.* at 709. The court concluded that the firm's failure to review any of the twenty-eight account statements from American Express after the employee obtained the card constituted a negligent omission that cloaked the office manager in apparent authority, despite the fact that her charges otherwise would have been considered unauthorized under TILA. *Id.* at 709-10. In a more recent case relying on *Minskoff*, the Second Circuit similarly held that, because a cardholder "did not review his credit card statements during a two-year period while continuing to pay bills without protest, the charges made by an employee that had fraudulently obtained and used his credit card were cloaked in apparent authority." *Carrier v. Citibank, N.A.*, 180 Fed. Appx. 296, 296-97 (2d Cir. 2006). The court in *Carrier* held that apparent authority precluded the cardholder's claims based on the rationale of *Minskoff*. *Id*.

9

Similarly, the D.C. Circuit has concluded that a company's continued payment of fraudulent credit card charges is a negligent act that gives rise to apparent authority, although it differed from the *Minskoff* approach in declining to hold that a company's failure to inspect credit card statements constitutes a negligent omission giving rise to apparent authority. *DBI Architects*, 388 F.3d at 887. In *DBI Architects*, an architectural firm's account manager, who was authorized to approve and pay expenses on the firm's corporate credit account but not to make charges on it, obtained a corporate card and proceeded to charge personal expenses to the firm's account. *Id.* at 887-88. The card issuer, American Express, detailed the account manager's fraudulent use of the card in monthly statements sent to the firm, which the account manager paid with forged checks from the firm's account. *Id.* at 889. Although the firm did not review the statements, it continued to pay them in full. *Id.* at 893. The D.C. Circuit concluded that, based on the firm's continued payment after receiving notice of the fraud in the form of statements from American Express, "no reasonable juror could disagree that at some point that cardholder led the card issuer reasonably to believe that the fraudulent user had authority to use its card," and that, therefore, the firm was estopped from denying apparent authority. *Id.* at 894.

Based on the foregoing principles, American Express argues that Permobil's continued payment of the fraudulent charges after receiving statements from American Express detailing the charges constitutes a negligent act that cloaked the Haneys in apparent authority as a matter of law, preventing Permobil from asserting that the Haneys' use of the card was unauthorized, as required to establish a claim under TILA.[9] (Docket No. 16 at 6.) According to American

___

[9]American Express also argues that Permobil's failure to examine its statements constitutes a negligent omission that establishes apparent authority under *Minskoff*. (Docket No. 16 at 8.) However, there is a factual question as to whether Permobil received statements from

10

Express, like the cardholder in *DBI Architects*, the Haneys were able to perpetrate their fraud because Permobil had failed to separate its "approval and payment functions within its cash disbursement process," allowing Mrs. Haney to both review and pay the American Express account and protecting her fraud from earlier detection. (Docket No. 16 at 7.)

While the facts alleged by Permobil may permit the conclusion that apparent agency arose at some point during the three years in which Permobil paid the Haneys' charges without reviewing its statements from American Express, they do not necessarily require it.[10] The principles of agency law require a third party to act *reasonably* in its reliance upon the apparent authority of an agent. *See* Restatement (Second) of Agency § 7 (emphasis added). As the Tennessee Supreme Court explained, "[t]he liability of the principal is determined . . . by what

American Express. Moreover, even if Permobil did receive statements from American Express, the court need not decide whether Permobil's failure to review those alone would constitute a negligent omission cloaking the Haneys in apparent authority, as the Complaint indicates that Permobil continued to pay the Haneys' charges in addition to failing to review its statements, like the plaintiff in *DBI Architects*, and in contrast to the plaintiff in *Minskoff*. As the D.C. Circuit explained in *DBI Architects*, even if a cardholder has no duty to review its account statements under TILA, a cardholder "cannot avoid liability for [a user's] fraudulent charges because its repeated payments in full after notice led [a card issuer] reasonably to believe that [the user] had the authority to use [the cardholder's] corporate credit card." 388 F.3d at 891-93.

[10]In an attempt to distinguish the instant case from those on which American Express relies, Permobil argues that the Haneys fraudulently acquired Mr. Combs' card rather than one in their own names, arguing that TILA does not permit a finding of apparent authority where a credit card issued in the name of one person is stolen and used by another. (Docket No. 7-8.) While Permobil correctly notes that the card users in the cases on which American Express relies fraudulently obtained a corporate credit card in their own names, unlike the Haneys, who simply used a card issued in Mr. Combs' name, none of these cases is limited to cases in which a card user fraudulently obtains a corporate card in his or her own name. *See Carrier*, 180 Fed. Appx. 296; *DBI Architects*, 388 F.3d 886; *Minskoff*, 98 F.3d 703. Moreover, as the district court explained in *Carrier*, the user in that case did not fraudulently obtain a card issued in her own name, but rather aquired a credit card issued in the name of a fellow employee. *Carrier*, 383 F. Supp. 2d at 336. On appeal, the Second Circuit affirmed the district court's finding of apparent authority as a matter of law. *Carrier*, 180 Fed. Appx. 296-97.

authority the third person, exercising reasonable care and prudence, was justified in believing that the principal had by his acts under the circumstances conferred upon his agent." *Southern Ry. Co. v. Pickle*, 197 S.W. 675, 677 (Tenn. 1917); *cf.* Restatement (Second) of Agency § 166 cmt. b ("If . . . the third person has reason to believe that the agent is acting for his own benefit, he cannot subject the principal to liability upon a contract which in fact is unauthorized."). "Where circumstances indicate that the agent may be acting in fraud of the principal, a person dealing with the agent is required to exercise care in investigation in order to hold the principal liable." Restatement (Second) of Agency § 166 cmt. c.

Here, Permobil argues that many of Haney's fraudulent charges were "highly suspicious and should have put [American Express] on notice that the charges were not for company business and were not authorized by Permobil." (Docket No. 29 at 10.) Specifically, Permobil alleges that the Haneys' charges, including fireworks worth $27,000, jet skis worth $25,000, children's clothing, an airline ticket in the name of "Johnny Haney," gift cards, and sporting goods worth over $11,500, were obviously unrelated to Permobil's business. (Docket No. 1 ¶ 14.) Additionally, Permobil alleges that Mr. Haney left disproportionately large tips at local restaurants as a systematic method of obtaining cash back from his use of the Permobil American Express card (Docket No. 1 ¶ 15, Ex. A) and that the signature used by Mr. Haney did not match the signature that American Express had on file for the card, which remained in Mr. Combs' name (Docket No. 1 ¶ 16). Finally, Permobil has alleged that American Express advertised its ability to monitor the account for "uncharacteristic or unusually high charges." (Docket No. 1 ¶ 17.)

12

Given the "highly suspicious" nature of the Haneys' charges, the circumstances plausibly indicated that Mrs. Haney may have been acting in fraud of Permobil, requiring American Express to act reasonably in investigating the situation.[11] *See* Restatement (Second) of Agency § 166 cmt. c. If the circumstances indicated that Mrs. Haney may have been acting in fraud of Permobil, and American Express did not exercise reasonable care, then American Express' argument that apparent authority existed fails. *See id.* Therefore, although apparent authority may have arisen at some point during the three and one-half years that Permobil paid bills containing fraudulent charges made by the Haneys, it is also plausible that apparent authority did not arise if American Express' actions were not reasonable. Without further development of the factual record, the court cannot determine whether American Express acted reasonably, and, therefore, the question of whether Permobil cloaked the Haneys in apparent authority cannot be determined as a matter of law.[12]

---

[11]The court recognizes that the "highly suspicious" nature of the Haneys' charges also supports American Express' argument that apparent authority arose precisely because Permobil continued to pay its bills despite the "highly suspicious" nature of the charges. (Docket No. 30 at 6.)

[12]American Express argues that, because *DBI Architects* and *Minskoff* did not address whether the card issuer acted reasonably in response to the card user's potentially fraudulent charges and *Carrier* only addressed the reasonableness question in the context of the cardholder's negligence claim, a card issuer's possible negligence does not bar dismissal of a TILA claim. (Docket No. 30 at 7.) However, as noted *supra*, TILA relies on general agency principals in defining "unauthorized use." Under these principles, apparent authority is only established where a third party's reliance on an agency authority is reasonable, *see Pickle*, 197 S.W. at 677; Restatement (Second) of Agency § 7, and, if the circumstances are such that the agent may be acting in fraud of the principal, the third party must reasonably investigate the situation, *see* Restatement (Second) of Agency § 166 cmt. c. Therefore, despite American Express' argument to the contrary, whether American Express acted reasonably in response to the Haneys' "highly suspicious" charges is relevant to whether Permobil has stated a claim under TILA, as such behavior speaks to the issue of apparent authority and, thus, whether the Haneys' charges constitute "unauthorized use" under the statute.

13

Furthermore, even assuming *arguendo* that the court could conclude that the Haneys were cloaked in apparent authority as a matter of law, the court could not dismiss this case because it would still be unable to determine *when* that apparent authority arose. American Express' argument in favor of dismissal implies that, if apparent authority were established at all, Permobil should be barred from any recovery under TILA and liable for the full extent of the Haneys' fraudulent charges. (Docket No. 16 at 8-9.) However, as the Second Circuit explained, "[a]pparent authority created through the cardholder's negligence does not . . . retroactively authorize charges incurred prior to the negligent acts that created the apparent authority of the user." *Minskoff*, 98 F.3d at 709. In *Minskoff*, the court held that the card issuer remained liable for the fraudulent charges from the point at which the cardholder's office manager fraudulently obtained the card until the time that the cardholder received the first statement detailing the fraudulent charges, "plus a reasonable time to examine the statement." *Id.* at 710. The cardholder was only responsible for fraudulent charges made after that time had elapsed. *Id.* (remanding the case in order to determine whether any triable issue of fact remained). Likewise, the D.C. Circuit concluded that, although the cardholder was "estopped from avoiding liability . . . for the charges [the accounts manager] incurred on the corporate accountant after her apparent authority arose," it could not resolve "the question of when apparent authority arose . . . as a matter of law." *DBI Architects*, 388 F.3d at 894. Because no statute or other authority established a point at which apparent authority emerged following a cardholder's receiving notice of potential fraud, the court remanded the case to district court to determine "at what point DBI's payment created apparent authority and thereby terminated DBI's protection under the statute." *Id.*

Case 3:08-cv-00262   Document 38   Filed 08/06/08   Page 14 of 33 PageID #: 284

Together, these cases demonstrate that, even where apparent authority is established at some point, the card issuer remains liable for fraudulent charges made up to the point at which the cardholder's negligent act or omission creates apparent authority, shifting liability to the cardholder. Therefore, even if Permobil's continued payment of the Haneys' fraudulent charges after notice constitutes a negligent act that cloaked the Haneys in apparent authority, this authority emerged no earlier than the point at which Permobil received a statement that would have revealed the Haneys' fraudulent charges, plus some reasonable time thereafter. *See Minskoff*, 98 F.3d at 710. However, Permobil's Complaint states only that Mrs. Haney paid Permobil's American Express account via the internet and that she and her husband "destroyed and/or hid any American Express invoices or statements" that would have revealed their fraud. (Docket No. 1 ¶ 11.) These statements provide no insight as to when — or even whether — Permobil received any American Express invoices or statements that would have provided notice of the Haneys' fraudulent charges and rendered Permobil's continued payment of the charges a negligent act that created apparent authority. Thus, even if the court were to determine that Permobil's actions create apparent authority as a matter of law, it could not determine the point at which this authority arose.

For the forgoing reasons, the defendants' motion to dismiss the plaintiffs' TILA claim will be denied.

**III.    State Law Claims**

In addition to asserting claims arising under TILA, the plaintiffs also assert state law tort claims of conversion, negligence, and misrepresentation, as well as a claim under the Tennessee Consumer Protection Act. (Docket No. 1 ¶¶ 26-38.) The defendants argue that the state law tort

15

claims of conversion, negligence, and misrepresentation are preempted by TILA. (Docket No. 16 at 9-10.) Additionally, the defendants argue that the plaintiffs have failed to state a claim for conversion, negligence, or misrepresentation, or a violation of the Tennessee Consumer Protection Act. (Docket No. 16 at 10-14.)

     A.     *Preemption*

In order to determine whether federal law preempts state law, a court looks to the intent of Congress. *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 562 (6th Cir. 1998). Preemption of state law occurs where Congress has expressly preempted state law, where Congress has legislated so throughly that it has left no room for state law, or where federal law actually conflicts with state law. *Id.* at 562-63. Here, American Express argues that Permobil's state law tort claims either are expressly preempted by Regulation Z (Docket No. 16 at 9-10) or are implicitly preempted because they conflict with TILA (Docket No. 30 at 9-12).

Turning first to the express preemption argument, the Federal Reserve Board of Governors issued Regulation Z in order to implement TILA to "[regulate] certain credit card practices . . . and [provide] a means for fair and timely resolution of credit billing disputes." 12 C.F.R. § 226.1. Included among its "Special credit card provisions," Regulation Z dictates the liability of a cardholder for unauthorized use of a credit card and the right of a cardholder to assert claims or defenses against a card issuer.[13] *See* 12 C.F.R. § 226.12(b-c). Relying on the text

---

[13]Regulation Z states, in relevant part:

(b) Liability of cardholder for unauthorized use — (1) Limitation on amount. The liability of a cardholder for unauthorized use of a credit card shall not exceed the lesser of $50 or the amount of money, property, labor, or services obtained by the unauthorized use before notification to the card issuer under paragraph (b)(3) of this section.

16

and structure of section 226.12, American Express argues that Permobil's state law tort claims are expressly preempted.(Docket No. 16 at 9-10.) Specifically, American Express notes that Subsection (c) of section 226.12, which addresses a cardholder's right to assert claims against a card issuer, states that "the cardholder may assert against the card issuer all claims (other than state law tort claims)." 12 C.F.R. § 226.12(c). Based on this language, American Express contends that, because Subsection (c) follows Subsection (b), which addresses a cardholder's liability for unauthorized use of a credit card, Subsection (c) also applies to Subsection (b),

---

(2) Conditions of liability. A cardholder shall be liable for unauthorized use of a credit card only if:

(I) The credit card is an accepted credit card;

(ii) The card issuer has provided adequate notice of the cardholder's maximum potential liability and of means by which the card issuer may be notified of loss or theft of the card. The notice shall state that the cardholder's liability shall not exceed $50 (or any lesser amount) and that the cardholder may give oral or written notification, and shall describe a means of notification (for example, a telephone number, an address, or both); and . . .

(iii) The card issuer has provided a means to identify the cardholder on the account or the authorized user of the card . . . .

(4) Effect of other applicable law or agreement. If state law or an agreement between a cardholder and the card issuer imposes lesser liability than that provided in this paragraph, the lesser liability shall govern . . . .

(c) Right of cardholder to assert claims or defenses against card issuer — (1) General rule. When a person who honors a credit card fails to resolve satisfactorily a dispute as to property or services purchased with the credit card in a consumer credit transaction, the cardholder may assert against the card issuer all claims (other than state law tort claims) and defenses arising out of the transaction and relating to the failure to resolve the dispute. The cardholder may withhold payment up to the amount of credit outstanding for the property or services that gave rise to the dispute and any finance or other charges imposed on that amount.

12 C.F.R. § 226.12(b-c) (footnotes omitted).

17

prohibiting state law tort claims in situations where a cardholder alleges unauthorized use. (Docket No. 30 at 9.) Therefore, according to American Express, because Permobil is alleging that the Haneys' charges constitute unauthorized use, its state law tort claims are preempted.[14] (Docket No. 30 at 9.)

However, American Express' argument that Subsection (c) modifies Subsection (b), thus prohibiting a cardholder from bringing state law tort claims against a card issuer in situations involving unauthorized use, is without merit. Subsection (c), which is separated from Subsection (b) by a new topic heading and which addresses the right of a cardholder to assert claims or defenses against a card issuer, neither modifies Subsection (b) nor even refers to a cardholder's liability in the case of unauthorized use, the issue addressed in Subsection (b).[15] *Compare* 12 C.F.R. § 226.12(b) *with* 12 C.F.R. § 226. 12(c). Rather, Subsection (c) confers on a cardholder an additional remedy, permitting a cardholder to assert claims related to "property or services

---

[14]American Express also argues that Subsection (c) requires Permobil to attempt to resolve the disputed charges that emerged from the Haneys' alleged unauthorized use with each individual merchant prior to bringing claims directly against it. (Docket No. 30 at 8.) However, as will be discussed *infra*, this argument rests on Permobil's specious argument that Subsection (c) modifies Subsection (b). Despite Permobil's argument to the contrary, Subsection (c) only requires a cardholder to dispute charges with individual merchants prior to bringing claims against a card issuer in cases that emerge from disputes related to the "property or services purchased with a credit card," rather than those related the to unauthorized use of a card. 12 C.F.R. § 226.12(c).

[15]The text of Subsection (b) itself does not expressly preempt any state law claims. *See* 12 C.F.R. § 226.12. Under the subheading "Effect of other applicable law or agreement," Subsection (b) discusses the way in which its unauthorized use provisions interplay with state law and contracts between card issuers and cardholders, imposing the least liability on the card holder. 12 C.F.R. § 226.12(b)(4). If Regulation Z's drafters had intended to preempt state law tort claims in the case of unauthorized use, it could have made a statement to that effect in this subpart of Subsection (b). However, notably absent in this subpart and throughout Subsection (b) is any discussion of state law preemption. 12 C.F.R. § 226.12(b).

18

purchased with the credit card," that it could have brought against a merchant against the card issuer instead. *See* 12 C.F.R. § 226.12(c). As an exception to this remedy, Subsection (c) prevents a cardholder from bringing state law tort claims against a card issuer. *Id.* However, this provision does not appear to prevent a cardholder from bringing tort claims against a card issuer where the claims do not relate to a dispute with a merchant regarding products or services. Therefore, Subsection (c) does not modify Subsection (b), and its provision limiting state law tort claims does not apply where a cardholder alleges unauthorized use of a credit card, rather than a dispute over products or services.[16]

In addition to the text and structure of Regulation Z, the fact that TILA's credit card provisions were enacted in response to concerns about rampant credit card fraud, *see DBI Architects*, 388 F.3d at 889; *Towers*, 933 F.2d at 177, further indicates that the statute does not expressly preempt state law tort claims. In passing TILA, Congress intended for card issuers to protect cardholders from fraud, intuiting that such an arrangement would stimulate more efficient loss-protection mechanisms. *DBI Architects*, 388 F.3d at 891-92. As the D.C. Circuit recognized, Regulation Z similarly reflects TILA's remedial purpose. *Id.* at 892. Given this purpose, courts construe TILA's provisions liberally in favor of consumers. *See, e.g.*, *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 621 (6th Cir. 2002). Therefore, American Express' assertions that Regulation Z expressly preempts state law tort claims and that, prior to asserting claims involving unauthorized use against a card issuer, a cardholder must first attempt to resolve them with each

---

[16]American Express argues that, under this reading, Subsection (c) applies in only "very limited circumstances" and that neither the text of the regulation nor any authority limits Subsection (c) in this manner. (Docket No. 30 at 9.) However, American Express has failed to provide case law to support its preferred interpretation of the regulation, instead urging the court to adopt a strained reading of the regulation.

19

individual merchant, lack merit. Such a reading would run contrary to Congressional intent, burdening cardholders and limiting their remedies. Absent a clear statement otherwise, the court will not interpret Regulation Z in a manner so contrary to TILA's purpose. For these reasons, Permobil's claims are not expressly preempted.

Having rejected American Express' argument that Permobil's claims are expressly preempted, the court turns to American Express' argument that Permobil's claims for negligence, conversion, and misrepresentation are preempted because they conflict with TILA.[17] TILA preempts state law only to the extent that it actually conflicts with federal law. *Cavette v. Mastercard Int'l, Inc.*, 282 F. Supp. 2d 813, 816 n.3 (W.D. Tenn. 2003); *Heastie v. Cmty. Bank of Greater Peoria*, 690 F. Supp. 716, 721 (N.D. Ill. 1988). However, as the Supreme Court has explained, such a conflict exists only where "compliance with both federal and state regulation is a physical impossibility" or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Fid. Fed. Sav. & Loan Assoc. v. de la Cuesta*, 458 U.S. 141, 153 (1982) (citations omitted); *see King v. Ford Motor Co.*, 209 F.3d 886, 891 (6th Cir. 2000). With regard to Permobil's negligence and conversion claims, American Express merely argues that these claims are preempted because they would impose duties on card issuers that are "nebulous" and, therefore, "not consistent with the very clear duties" imposed under TILA. (Docket No. 30 at 10.) This characterization of its duties notwithstanding, American Express has failed to show either that it is physically impossible to comply with both TILA and with the duties imposed by the common law under theories of negligence and

---

[17]American Express does not argue that Permobil's claim under the Tennessee Consumer Protection Act its preempted based on its conflict with TILA. (*See* Docket No. 30 at 8-12.)

conversion or that such duties would run contrary to Congress' purpose in enacting TILA. Therefore, TILA does not preempt Permobil's negligence and conversion claims based on a conflict between federal and state law.

With regard to Permobil's misrepresentation claim, American Express argues that, because this claim requires it to take actions that contradict TILA's disclosure requirements, it is preempted by TILA. (Docket No. 30 at 10-12.) Section 226.6 of Regulation Z requires a card issuer to issue an initial disclosure statement that "outlines the consumer's rights and the creditor's responsibilities . . . and that is substantially similar to the statement found in appendix G."[18] 12 C.F.R. § 226.6(d). With regard to the preemptive effects of this requirement, Regulation Z explains:

> A State law is inconsistent if it requires a creditor to make disclosures or take actions that contradict the requirements of the Federal law. A State law is contradictory if it requires the use of the same term to represent a different amount or a different meaning than the Federal law, or if it requires the use of a term different from that required in the Federal law to describe the same item.

12 C.F.R. § 226.28. As at least one court has noted, "it is clear from the narrow wording of these provisions that preemption was intended to extend only to specific state disclosure requirements, in the interest of preserving *uniform* methods of disclosure." *Heastie*, 690 F. Supp. at 720

---

[18] Appendix G's model disclosure clause states:

> You may be liable for the unauthorized use of your credit card [or other terms that describe the credit card]. You will not be liable for unauthorized use that occurs after you notify [name of card issuer or its designee] at [address], orally or in writing, of the loss, theft, or possible unauthorized use. In any case, your liability will not exceed [insert $50 or any lesser amount under agreement with cardholder].

12 C.F.R. § 226 app. G (bracketed portions in the original).

21

(explaining that this view comports with TILA's purpose to assure a meaningful disclosure of credit terms) (emphasis in original). Therefore, "[p]remption does not extend to general state statutes prohibiting fraud." *Id.* (concluding that TILA did not bar a cardholder's claim under Illinois' consumer protection act) (citation omitted).

Here, American Express contends the statements regarding its "Fraud Protection Guarantee" and "Fraud Detection System" (Docket No. 1 Ex. B), on which Permobil bases its misrepresentation claim, are consistent with Regulation Z and similar to the regulation's model statement.[19] (Docket No. 30 at 10-12.) Thus, American Express argues, since the misrepresentation claim is based on statements that are "part of [TILA's] disclosure requirement," any state law tort claim arising out of those statements conflicts with its obligations under TILA and is therefore preempted. (Docket No. 30 at 11-12.)

However, the defendants' argument fails for a number of reasons. First, while some of the statements included in the "Fraud Protection Guarantee" mirror those of the model disclosure statement required under TILA, Permobil's misrepresentation claim is based not only on those particular aspects of the "Fraud Protection Guarantee" that mirror the TILA disclosure requirement, but also on other statements contained in the "Fraud Protection Guarantee" that are not required, nor even similar to those required, by TILA. (*See* Docket No. 1 ¶ 17, Ex. B; Docket No. 29 at 17.) Additionally, while a misrepresentation claim imposes an additional duty on the defendant, it is not an inconsistent state law as defined in Regulation Z because it does not

_____

[19]As evidence of the similarity between its "Fraud Protection Guarantee" and Regulation Z's model clause, American Express notes that the website states that "[i]f any fraudulent charge appears on your statement, simply notify us at the 800 number on the back of your Card, or access your account at americanexpress.com/myca and notify us by e-mail." (Docket No. 30 at 11 (citing Docket No. 1 Ex. B).)

22

require American Express to make disclosures or take action that contradicts TILA. *See* 12

C.F.R. § 226.28. Rather, it merely requires that, if American Express chooses to make statements

beyond those required by TILA, it must ensure that those statements comport with its state law

tort duty to avoid misrepresentation. American Express fails to explain, and the court cannot

comprehend, how the imposition of a state law tort duty to avoid misrepresentation would force

it to make a disclosure or take another action inconsistent with the disclosure requirements under

TILA. Therefore, TILA does not preempt Permobil's misrepresentation claim.

      **B.**    *Conversion Claim*

      An intentional tort, conversion is "the appropriation of [a] thing to [a] party's own use

and benefit, by the exercise of dominion over it, in defiance of Plaintiff's right." *Barger v. Webb*,

391 S.W.2d 664, 665 (Tenn. 1965) (citing *A. J. Roach & Co. v. Turk*, 56 Tenn. 708 (Tenn.

1872)); *Richter v. Rosenberg*, No. W2007-01486-COA-R3-CV, 2008 Tenn. App. LEXIS 299, at

*30 (Tenn. Ct. App. May 20, 2008) ("Conversion is an intentional tort, and a party seeking to

make out a *prima facie* case of conversion must prove (1) the appropriation of another's property

to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance

of the true owner's rights.").

      In an action for conversion, "the main focus of the tort is the interference with an owner's

property right. The degree of this interference, as well as the impact on the property, determines

whether there has been a conversion." *Gen. Elec. Credit Corp. v. Kelly & Dearing Aviation*, 765

S.W.2d 750, 753 (Tenn. Ct. App. 1988). In order to be liable for conversion, a defendant "need

only have an intent to exercise dominion and control over the property that is in fact inconsistent

with the plaintiff's rights, and do so." *Mammoth Cave Prod. Credit Assoc. v. Oldham*, 569

S.W.2d 833, 836 (Tenn. Ct. App. 1977) (citation omitted). The defendant's intention "need not be a matter of conscious wrongdoing, but can merely be an exercise of dominion or control over the property in such a way that would be inconsistent with the owner's rights and which results in injury to him." *Gen. Elec. Credit Corp.*, 765 S.W.2d at 753-54. Whether the defendant acts in good faith is generally immaterial, although, in some instances, this rule has been relaxed. *Mammoth Cave*, 569 S.W.2d at 836.

The tort of conversion may lie "where a defendant may have rightfully obtained possession of the property of the owner but refuses to return it to the owner when legally required to do so." *Greer v. Corrections Corp. of Am.*, No. 01-A-01-9604-CH-00150, 1996 Tenn. App. LEXIS 775, at *4 (Tenn. Ct. App. Dec. 6, 1996) (citing *Crocket & Woodson v. Beaty*, 27 Tenn. 20 (1847)). By making a rightful demand for the return of his property, a plaintiff establishes a *prima facie* case of conversion, and the defendant must then show facts that constitute a justification or excuse for his failure to deliver it. *Chase Manhattan Bank v. CVE, Inc.*, 206 F. Supp. 2d 900, 910 (M.D. Tenn. 2002) (citing *Garvin v. Luttrell*, 29 Tenn. 16 (1848)).

Here, American Express argues that, because Permobil has merely alleged that American Express accepted payments in exchange for credit that it had extended, Permobil has failed to state a claim for conversion. (Docket No. 16 at 11.) According to American Express, these alleged facts do not constitute an intentional appropriation of American Express' property. (Docket No. 16 at 10-11.) However, Permobil has alleged other facts that may form the basis of such a claim. In particular, Permobil alleges that American Express refused to return the funds that Mrs. Haney transferred to it, even after Permobil informed American Express that Mrs.

24

Haney's transfer of the funds was fraudulent and unauthorized. (Docket No. 1 ¶ 20; Docket No. 29 at 18.) Because the question of whether Permobil was legally entitled to the funds remains an open question, American Express' refusal to return them may constitute an appropriation of Permobil's property for its own use or benefit, in defiance of Permobil's rights. Alternatively, American Express may be able to show that it was justified in refusing to return Permobil's funds because the Haneys were cloaked in apparent authority, making the transfer of the funds legitimate and negating Permobil's conversion claim. However, because the question of apparent authority cannot be determined at this stage in the litigation, *see* discussion *supra*, Permobil's conversion claim likewise cannot be dismissed. Finally, although American Express may have acted under a good faith belief that it had the right to the funds when it denied Permobil's request for a reimbursement, a defendant's good faith belief is generally immaterial to a conversion claim, *see Mammoth Cave*, 569 S.W.2d at 836, and, regardless, would present a factual question that cannot be resolved on a motion to dismiss.

C.      *Negligence Claim*

To establish a negligence claim, a plaintiff must prove: (1) a duty of care owed by the defendant to the plaintiff, (2) conduct by the defendant falling below the standard of care that amounts to a breach of that duty, (3) injury or loss, (4) causation in fact, and (5) proximate causation. *Coln v. City of Savannah, Tenn.*, 966 S.W.2d 34, 39 (Tenn. 1998), *overruled on other grounds by Cross v. City of Memphis*, 20 S.W.3d 642 (Tenn. 2000). Whether a defendant owes a plaintiff a duty is a question of law that "requires consideration of whether such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of others — or, more simply, whether the interest of the plaintiff which has suffered invasion was

25

entitled to legal protection at the hands of the defendant." *Coln*, 966 S.W.2d at 39 (quotation and citation omitted). In the instant case, American Express argues that Permobil's negligence claim must fail because it has failed to establish the duty element. (Docket No. 16 at 11-13.)

Where two parties enter into a contractual arrangement, their obligations to each other generally arise only out of the contract itself. *Thomas & Assoc., Inc. v. Metro. Gov't of Nashville*, No. M2001-00757-COA-R3-CV, 2003 WL 21302974, at *6 (Tenn. Ct. App. June 6, 2003) (citation omitted).

> If a duty to conform to a standard exists between the parties irrespective of contract, and the defendant is negligent, the damaged plaintiff, generally speaking, may sue in tort. However, if the only source of duty between a particular plaintiff and defendant is their contract with each other, then a breach of that duty, without more, ordinarily will not support a negligence action.

*Id.* (citation omitted). Additionally, absent special circumstances, Tennessee law does not impose common law duties on financial institutions with respect to their customers, depositors, or borrowers. *Power & Tel. Supply Co. v. SunTrust Banks, Inc.*, 447 F.3d 923, 932 (6th Cir. 2006) (citing *Glazer v. First Am. Nat'l Bank*, 930 S.W.2d 546, 550 (Tenn. 1996)); *Oak Ridge Precision Indus., Inc. v. First Tenn. Bank Nat'l Ass'n*, 835 S.W.2d 25, 30 (Tenn. Ct. App. 1992). "This rests on the recognition that bank-depositor or debtor-creditor relationships generally involve arm's-length dealings." *Power & Tel. Supply Co.*, 447 F.3d at 932.

Here, Permobil acknowledges that it entered into a contractual relationship with American Express when Udden opened the credit card account. (Docket No. 1 ¶ 6.) Therefore, absent special circumstances, the parties' contractual relationship delineates their obligations to one another, and American Express does not owe any additional common law duty to Permobil. Attempting to distinguish the instant case from the foregoing principles, Permobil argues that,

26

because it did not negotiate an extensive commercial contract with American Express, but rather entered into a standard form agreement, the contract does not completely constitute the parties' mutual obligations. (Docket No. 29 at 15.) However, even if the parties utilized a standard form agreement to enter into their debtor-creditor relationship, because the use of such a contract does not, in and of itself, show that the parties' dealings were not conducted at arm's length, Permobil cannot escape the Sixth Circuit's logic in *Power & Tel. Supply Co*. In the context of a debtor-creditor relationship, Tennessee does not impose a common law duty on the financial institution.[20] *Id.*

Additionally, although Permobil relies on language stating a plaintiff may bring a negligence claim where a defendant "violates a duty, independent of the contract, arising from wider principles of social responsibility," *Thomas & Associates*, 2003 WL 21302974, at *6, that reliance is misplaced. Permobil argues that, because American Express represented that its "Fraud Detection System" monitored a customer's account for potential fraud, as a matter of public policy, American Express had a duty to monitor Permobil's account for such activity, giving rise to a negligence claim where it fails to do so. (Docket No. 29 at 16.) However, the "Fraud Detection System" itself is based in the contractual relationship that American Express maintains with its customers, rather than any general principles of social responsibility.

---

[20]Permobil also notes that its agreement with American Express does not explicitly preclude a negligence claim, implying that it may therefore bring one. (Docket No. 29 at 15.) However, regardless of whether the parties' contractual arrangement permits such a claim, in order to survive American Express' motion to dismiss, Permobil must show that it can plausibly recover under a negligence theory; specifically, Permobil must show that American Express owes it a duty, and the contract's silence as to the issue of Permobil's purported negligence claim does not establish that American Express owes it any duty outside the terms of the contract.

Therefore, while American Express' representation may give rise to claims in contract, American Express' statement about its "Fraud Detection System" does not give rise to an independent duty in tort outside the parties' written agreement.[21]

As the Complaint does not sufficiently allege that American Express owed the plaintiffs a duty, the negligence claim will be dismissed.

### D. Misrepresentation Claims

Under Tennessee law, to establish a claim of intentional misrepresentation, a plaintiff must demonstrate (1) a representation of an existing or past fact, (2) that the representation was false when it was made, (3) that it related to a material fact, (4) that it was made knowingly, recklessly, or without belief in its truth, (5) that the plaintiff reasonably relied on the misrepresentation, and (6) that the plaintiff suffered injury as a result of his or her reliance on the misrepresentation. *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008); *see also Power & Tel. Supply Co.*, 447 F.3d at 931 (citing *Stacks v. Saunders*, 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990)). Because a claim for intentional misrepresentation is "analyzed as a claim for fraud," it must be pleaded with particularity, which requires a plaintiff to allege "the time, place and content of the misrepresentations; the defendant's fraudulent intent; the

---

[21]Permobil also argues that TILA imposes a duty on American Express to exercise reasonable care to discover whether unauthorized use has occurred or may occur (Docket No. 29 at 16), relying on language in TILA that a cardholder may not be held liable for unauthorized charges unless the charges occur "before the card issuer has been notified that an unauthorized use of the credit card has occurred or may occur," 15 U.S.C. § 1643(a)(1)(E). However, while Congress intended for a card issuer to bear the burden of any losses for fraud, *DBI Architects*, 388 F.3d at 891-92, the statute does not give rise to a state law duty in tort but rather gives rise only to a TILA claim, which Permobil has asserted.

28

fraudulent scheme; and the injury resulting from the fraud." *Power & Tel. Supply Co.*, 447 F.3d at 931.

A claim for negligent misrepresentation is established if the plaintiff demonstrates (1) that the defendant supplied information to the plaintiff, (2) that this information was false, (3) that the defendant "did not exercise reasonable care in obtaining or communicating the information," and (4) that the plaintiff "justifiably relied on the information." *Walker*, 249 S.W.3d at 311; *see also Menuskin v. Williams*, 145 F.3d 755, 762-63 (6th Cir. 1998) (citing *John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 431 (Tenn. 1991)). As with a claim for intentional misrepresentation, a negligent misrepresentation must relate to a material past or existing fact. *See Gleason v. Freeman*, No. 06-2443-JPM/tmp, 2008 U.S. Dist. LEXIS 52304, at *12 (W.D. Tenn. June 17, 2008); *York v. Branell College*, No. 02A01-9209-CV-00257, 1993 Tenn. App. LEXIS 732, at *38 (Tenn. Ct. App. Nov. 23, 1993); *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982).

The plaintiffs' misrepresentation claims are based on statements made by the defendants with respect to their "Fraud Protection Guarantee" and "Fraud Detection System." (Docket No. 1 ¶ 35.) Specifically, the plaintiffs allege that American Express "represented that it had such a system which 'watches your account for uncharacteristic or unusually high charges,'" but that American Express's failure to detect the Haneys' fraud earlier indicates that no such system existed. (Docket No. 29 at 17.) The defendants argue that these allegations do not state a claim for misrepresentation, as the statements relating to the "Fraud Protection Guarantee" and the "Fraud Detection System" do not pertain to a past or present fact. (Docket No. 16 at 14.) The defendants further argue that the plaintiffs' reliance on these representations was not reasonable,

in part because the guarantee required the plaintiffs to notify the defendants of any fraudulent charges, which the plaintiffs did not do for years after the first fraudulent charges were made.

Contrary to the defendants' assertion, the alleged misrepresentations do pertain to a past or present fact — the existence of a system for detecting fraud and a guarantee regarding the plaintiffs' liability for any such fraud. Moreover, the question of whether the plaintiffs' reliance on the alleged misrepresentations was reasonable is a factual question not amenable to resolution on a motion to dismiss, regardless of whether the guarantee required some action on the plaintiffs' part. As such, the defendants' motion to dismiss the plaintiffs' misrepresentations claims will be denied.

E.    *Tennessee Consumer Protection Act Claim*

Finally, the plaintiffs here asserted a claim that the defendants' conduct constituted unfair and deceptive acts and practices in violation of the Tennessee Consumer Protection Act ("TCPA").[22] (Docket No. 1 ¶¶ 36-38.) The defendants have moved to dismiss this claim on several grounds.

First, the defendants argue that the transactions in question are exempt from the TCPA. (Docket No. 16 at 15-16.) The statute does not apply to "[a]cts or transactions required or specifically authorized under the laws administered by, or rules and regulations promulgated by, any regulatory bodies or officers acting under the authority of this state or of the United States." Tenn. Code Ann. § 47-18-111(a)(1). However, the transactions at issue here are not required by the laws of the United States or Tennessee. Rather, the plaintiffs challenge the defendants'

---

[22]The plaintiffs additionally asserted a claim pursuant to the Utah Consumer Sales Practices Act. (Docket No. 1 ¶¶ 36-38.) The defendants have not moved to dismiss that claim.

statements with respect to the "Fraud Protection Guarantee" and the "Fraud Detection System" and allege that the defendants refused to abide by TILA and reimburse Permobil for fraudulent charges. (Docket No. 1. ¶ 37.) None of these actions were required by federal or state law, and thus none are exempt from the TCPA. Additionally, the defendants' reliance on *Smith v. First Union Nat'l Bank of Tennessee*, 958 S.W.2d 113 (Tenn. Ct. App. 1997), is misplaced. In that case, the plaintiff asserted a TCPA claim against a bank, arguing that the bank's policy of paying multiple checks presented for payment on a single day beginning with the largest check was deceptive and unfair, as it maximized the fees and penalties that the bank could charge the customer if there were insufficient funds to pay all of the checks rather than maximizing the number of checks that could be paid. *Id.* at 114. The court held that the plaintiff had not established a TCPA claim because the bank was "expressly authorized [by a state statute] to do the acts of which the plaintiff complains." *Id.* at 116-17. In this case, there is no such federal or state statute, like that in *Smith*, which authorizes the defendants' actions that form the basis of the plaintiffs' TCPA claim.

The defendants next argue that the plaintiffs have failed to state a claim, as they do not allege any unfair or deceptive acts that could establish a TCPA violation and as the existence of a TILA claim does not establish a TCPA claim *per se*. (Docket No. 16 at 16-18.) Again, however, the defendants' alleged misrepresentations relating to the "Fraud Detection System" and the "Fraud Protection Guarantee" may establish unfair and deceptive conduct in violation of the TCPA if indeed the guarantee and the system did not in fact exist. Moreover, the question of whether the plaintiffs' reliance was reasonable, which the defendants assert as another ground

for dismissing the TCPA claims, is a question of fact that cannot be resolved on a motion to

dismiss.

## **CONCLUSION**

For the reasons discussed herein, the Motion to Dismiss filed by the defendants will be granted as to the plaintiffs' negligence claim and denied as to the plaintiffs' Truth in Lending Act, conversion, misrepresentation, and Tennessee Consumer Protection Act claims.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge